Submitted December 18, 2013, remanded for entry of a corrected judgment omitting the challenged "no contact" provision; otherwise affirmed December 10, 2014, petition for review denied May 14, 2015 (357 Or 299)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STEVEN PAUL BLAYLOCK,
*Defendant-Appellant.*

Deschutes County Circuit Court
10FE1356MA; A150228

341 P3d 758

Peter Gartlan, Chief Defender, and Daniel Bennett, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Janet A. Klapstein, Senior Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

HADLOCK, J.

## HADLOCK, J.

Defendant's wife disappeared in late 2010. A few days after a police officer confronted defendant with physical evidence potentially linking him to that disappearance, officers discovered what appeared to be a suicide note written by defendant in which he confessed to having done something that could not be forgiven and indicated where his wife's body could be found. Defendant was arrested and charged with one count of murder constituting domestic violence, ORS 163.115. At trial, defendant admitted to killing his wife, but asserted that he had accidentally caused her death while defending himself from her attacks. Defendant was tried by a jury and found guilty. He appeals the resulting judgment of conviction.

In his first four assignments of error, defendant argues that the trial court improperly admitted evidence of the victim's out-of-court statements under various exceptions to the hearsay rule. In his fifth assignment of error, defendant challenges the trial court's imposition of no-contact provisions in its judgment. As explained below, we reject the evidentiary arguments that defendant makes in conjunction with his first four assignments of error and, therefore, affirm defendant's murder conviction. However, we reverse on his fifth assignment of error and remand for entry of a judgment that does not include the challenged no-contact provisions.

Because the jury found defendant guilty, we view the evidence in the light most favorable to the state.[1] *State v. Clegg*, 332 Or 432, 434, 31 P3d 408 (2001). Defendant and the victim met through mutual friends and married a few months later in August 2009. The victim worked as a respiratory therapist at a hospital, where her colleagues described her as an excellent employee with high standards who remained calm during medical crises.

On October 27, 2010, defendant had planned to drive from his home in Bend to his ex-wife's home in Silverton,

---

[1] However, when we are assessing the harmlessness of evidentiary error, we look at all pertinent evidence. *See State v. Cunningham*, 179 Or App 359, 361 n 2, 40 P3d 1065 (2002), *rev'd on other grounds*, 337 Or 528, 99 P3d 271 (2004).

which was approximately two hours away, for their daughter's birthday. Defendant called and told his ex-wife that he could not make it to Silverton that day because he and the victim had gotten into a fight. He did drive to his ex-wife's home three days later to attend his daughter's birthday party. He returned to her home the next day, October 31, to leave a trailer containing motorcycles, guns, and other items for storage.

At around the same time, defendant told several friends that the victim had left home on October 27 after a fight and had not returned. After learning about the victim's disappearance, some friends became concerned and tried unsuccessfully to contact her by phone. The victim's colleagues reported her missing to the police on November 2, when she did not come to work and they were unable to reach her by phone. Bend Police Officer Craig responded to the report from the victim's colleagues, performed a welfare check at the victim's residence, and began calling her friends and colleagues. Although defendant had not informed the police that the victim was missing, he agreed to be interviewed on November 2 after police contacted him. In that initial police interview, defendant told a detective that the victim had been drunk on October 27 and had struck his face, leaving a small gash. He also told the detective that he and the victim had gotten into another fight the next night, after which the victim had left home and not returned. Defendant also consented to a search of his home. Police officers left several voicemail messages for defendant after the initial interview, but he did not return the calls for several days.

On November 3, 2010, Bend Detective Tabor drove to defendant's ex-wife's home in Silverton and, with defendant's consent, searched the trailer he had left there four days earlier. During his initial search of the trailer, Tabor noticed two stains on the trailer's floor that he thought could be blood. On November 6, 2010, Tabor interviewed defendant about possible sources for any blood in the trailer. Defendant first suggested it could have been "red antifreeze" and later suggested it could have been his blood. After Tabor told defendant that it was a "significant amount of [recent] blood" that was "consistent with [the victim's] blood," defendant

explained that the victim had cut her knee while pulling weeds a few days before she disappeared and must have bled inside the trailer while watching him work on his motorcycles. That same day, defendant participated in a search party that was organized by the victim's friends.

On November 9, 2010, police officers searched defendant's home for a second time, pursuant to a warrant. Officers noted that a shotgun that had been unloaded during their first search of defendant's home was now loaded and in a different location. Officers also found what appeared to be a suicide note in the master bedroom nightstand. In that note, which was labeled "My Log," defendant wrote:

> "What I've done can't be forgiven. She pushed me [too] far last week, beating me down mentally and physically. I should have been man enough to walk away, but she just wouldn't stop. You will find her in the Santiam [River] 6 miles past Marion Forks, down from the big pull out turn around.
>
> "* * * This is not something I planned, I just snapped."

In a section of the note addressed to his children, defendant wrote, "Please stay away from the alcohol, you've seen what it has done to mine and others lives." Defendant was taken into custody. During a search of his wallet at the police station, officers found receipts dated October 23 and 24, 2010, for the purchase of two shotguns.

On November 12, 2010, defendant took police officers to the location described in his note where he claimed he had thrown the victim's body into the Santiam River. Officers recovered some of the victim's clothing, but her body was never found.

A few weeks after his arrest, defendant sent a letter to his cousin Jane, purporting to describe the events on the night leading up to the victim's death. In that letter, defendant claimed that he went to sleep and that the victim, who was drunk, came into the bedroom, jumped on top of him, forcibly took his wedding ring off his finger, and left the room. Around two hours later, she came back into the room and jumped on top of him again, striking him repeatedly and attempting to suffocate him with a pillow. Then,

defendant explained, he reached up in self-defense and grabbed the victim's throat with one hand and strangled her to unconsciousness. The victim then regained consciousness and jumped at him "growling like an animal," striking him repeatedly in the head, ribs, and genitals, until he was able to throw her off of him. According to defendant, the altercation ended when the victim "hit the corner of the bed, flipped over backward" and died after landing "upside down on her head and []neck." Defendant related similar versions of events in telephone conversations that he had with Jane while he was in jail.

After defendant's letter to Jane was introduced at trial, the state medical examiner testified that she thought it was "unlikely that [defendant] could strangle [the victim into] unconsciousness while she [was] above him" because it would be difficult to obtain the necessary leverage or pressure. The medical examiner also testified that death from a broken neck would require "quite a bit" of force and that it "doesn't seem likely" from defendant's description of events. She explained that death from a broken neck is typically seen in car crashes or "when people have * * * jumped from buildings to commit suicide." She added that, although "anything is possible," from her experience, the events described in defendant's letter were "improbable."

The medical examiner also testified that photos taken of defendant's body on November 2, 2010—the day that police officers first interviewed him—did not reflect the injuries that defendant described in his letter as having occurred on October 27:

> "Well, in reading the letter there was a description of multiple blows by fists and open hands to the face. And [defendant] states that [the victim] concentrated around his ears and the side of his head. So I would expect, given the description that he had of still having ringing in his ears from this event a month later, that there should be contusions or bruises on the side of his face or around his ears.

> "I don't see any contusions or bruises. I see what appears to be an abrasion, sort of a scratch type abrasion on his left cheek. That wouldn't come from say a fist or an open hand. So I don't see any indication of bruising around his head."

The jury also heard evidence about statements that the victim made to friends and colleagues during the several months leading up to her death, in which she described defendant's violence, her fear of him, her concern about his drinking, and her desire to obtain marital counseling. In closing arguments, the state asserted that defendant intentionally killed the victim, emphasizing the numerous times she had expressed fear about defendant before her death and defendant's behavior in the days following her disappearance. Defendant, on the other hand, maintained that he had acted in self-defense. He portrayed the victim as a heavy drinker who had been growing increasingly jealous in her relationship with defendant. He argued that the victim had been the aggressor on the night she died and that defendant had panicked in the aftermath when he threw her body in the river and lied to police. The jury found defendant guilty.

In his first four assignments of error on appeal, defendant argues that the trial court erred by admitting evidence about the statements the victim made before her death. According to defendant, those statements—which we describe in detail below—all were inadmissible hearsay to which no exception to the rule against hearsay applies.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OEC 801(3). Generally, hearsay is inadmissible unless it qualifies under an exception or exclusion from that general rule. OEC 802. In reviewing a trial court's ruling "that a statement fits within an exception to the hearsay rule," we will "uphold the trial court's preliminary factual determinations if any evidence in the record supports them." *State v. Cook*, 340 Or 530, 537, 135 P3d 260 (2006). We review "the trial court's ultimate legal conclusion, as to whether the hearsay statement is admissible under an exception to the hearsay rule, to determine if the trial court made an error of law." *Id.*

We begin by addressing defendant's second assignment of error, in which he challenges the admission of a statement that the victim made to her colleague, Knight,

approximately one day before her death.[2] Knight had worked with the victim for approximately 10 years, and the two worked together on October 26, 2010. At the end of her shift, the victim told Knight, "I hope he is not drunk when I get home," before she got in her car and drove away. Defendant objected to that part of Knight's testimony on the ground that the victim's statement to Knight was inadmissible hearsay. The state argued that Knight's testimony was admissible under the state-of-mind exception to the rule against hearsay, OEC 803(3), because it showed the "victim's state of mind on that date when she left work" and was relevant to defendant's "claim of self defense," as well as defendant's theory "that [the victim] was the one with the alcohol problem not Defendant." The trial court admitted Knight's testimony. Defendant reiterates his objection to that evidence on appeal.

OEC 803(3) provides:

"The following are not excluded by [OEC 802, the general rule against hearsay], even though the declarant is available as a witness:

"* * * * *

"(3)   A statement of the declarant's then existing state of mind, emotion, sensation or physical condition, such as intent, plan, motive, design, mental feeling, pain or bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of the declarant's will."

The "state-of-mind" exception to the rule against hearsay admits "statements of existing mental or emotional condition to prove the mental or emotional condition of the declarant at the time the statements were made." *State v. Richardson,* 253 Or App 75, 80, 288 P3d 995 (2012), *rev den,* 353 Or 714 (2013) (internal quotation marks, brackets, and emphasis omitted). "[E]ven if a statement merely reflects the declarant's state of mind or reasonably supports an inference as to the declarant's state of mind, it constitutes an assertion

---

[2] At the direction of the trial court, each of the evidentiary rulings was made after a formal offer of proof outside the presence of jurors. The content of trial testimony was largely consistent with the offer-of-proof testimony.

of the declarant's state of mind for purposes of OEC 803(3)." *Clegg*, 332 Or at 441. "A statement of then-existing fear meets the test of OEC 803(3)." *State v. Brown*, 310 Or 347, 358, 800 P2d 259 (1990).

Although defendant assigns error to the trial court's admission of Knight's testimony, asserting that it was inadmissible hearsay, he develops no argument specific to that evidence. Rather, he argues only generally that Knight's testimony—along with the other evidence of the victim's statements—was impermissibly "offered to prove the truth of the matter asserted" because any inference regarding the victim's state of mind "only arose if the jury accepted the truth of the [victim's] statements." Read literally, defendant's argument would be a *non sequitur* because, by characterizing the evidence as relating to an out-of-court statement offered to prove the truth of the matter asserted, defendant merely observes that the statement is hearsay that would be inadmissible if not for the existence of OEC 803(3). The argument does not, on its face, explain why that exception to the hearsay rule does not apply. It may be that defendant's abbreviated argument is meant to reference, instead, one constraint on the extent to which evidence may be admissible under OEC 803(3)—that a "statement of memory or belief" is not admissible "to prove the fact remembered or believed" except in circumstances not relevant here. OEC 803(3). However, Knight's testimony did not describe any statements by the victim of her memories or beliefs of past events. Rather, she was describing her then-existing state of mind related to her apprehension about going home and what she might encounter there. The evidence was therefore admissible under OEC 803(3), and the trial court did not err when it overruled defendant's objection to Knight's testimony.[3]

---

[3] Except as it relates to his "prior bad acts" argument, defendant did not object to Knight's testimony (or to other evidence of the victim's statements) on the ground that the evidence was not relevant because it had no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. Rather, he confined his objections to the applicability of OEC 803 exceptions to the hearsay rule and he similarly limits his argument on appeal. Accordingly, we do not discuss in detail the theories of relevance that the state urged when it offered the evidence at trial except as they relate to defendant's "prior bad acts" arguments.

In his third and fourth assignments of error, defendant challenges the admission, over his objections, of two statements that the victim made to Rebecca Brown in March and May 2010.[4] Brown met the victim through work and the two became close friends, often seeing each other outside of work. In March 2010, the victim called Brown and asked her to come over. Brown testified about the events of that night and what the victim told her:

"A: [The victim] called me that night because we were—because she was—or that morning after and said that she was very upset and she wanted me to come over right away. And I came over and she told me that [defendant] actually put his hands around her neck and strangled her and she passed out—fell against the wall in the bedroom.

"Q: How—what was [the victim's] demeanor as she was telling you this?

"A: She was very—very, very scared. She was very upset. She definitely was not herself.

"Q: And when you say not herself, what do you mean?

"A: Well, for one thing she was extremely embarrassed. I think we find sometimes, you know, when things like that happen you just—you feel mortified. She was very, very sad and frightened—just frightened. I remember that. She was very afraid.

"* * * * *

"A: I was very concerned. The reason she didn't report the incident as far as I know, as far as what she told me was that she was concerned about separating the Defendant from his children. She had very much had a lot of concern for his kids. * * *"

Rebecca Brown also testified about a night in May 2010, when the victim called her and asked her to come over.

"Q: Was there a later time when she contacted you again when something had happened?

---

[4] As discussed later in this opinion, another trial witness also had the last name of "Brown." To avoid confusion, we sometimes refer to Rebecca Brown and to that other witness using both their first and last names.

"A: Yes. In May she called me. It [w]as about 10:00 [or] 10:30 at night. She says you have got to come. I called the police. And so I went right over. And she was really upset. She had called the police and [defendant] was asked to leave and he left.

"Q: When you say that [the victim] was upset can I have you describe what your observation—

"A: She was shaky. She was shaky. She was crying. She was—her hand was swollen. I believe it was her right hand, her thumb area. She did not seem like herself. She wanted me to stay. She felt even more frightened this time than she did the last.

"Q: And when you say she didn't seem like herself what was different?

"A: Just not in control of her situation. In other words, just wanting me to stay, needing comfort, needing—*** she agreed to have the locks changed on the house.

"Q: Did you personally observe the locks get changed?

"A: Yes. Yes, I was there. That night she asked me to stay with her I stayed with her all night and held her hand. She was that afraid.

"Q: Did—to your knowledge after that incident did [the victim] and the Defendant reconcile?

"A: Yes. They did reconcile. She did change the locks. And I believe they were separated for maybe six days, seven days. I don't know. But she did reconcile. And at that time she wasn't returning my calls because I needed to know if she was all right. And she didn't return my calls. And then she finally said yes, we did. We are going to get counseling, I think."

Defendant objected, arguing that Rebecca Brown's testimony was inadmissible as "prior bad act evidence" and inadmissible hearsay. The state responded that the testimony was relevant under OEC 404 because defendant "opened that door when [he] filed the notice of self defense." The state also argued that the evidence should be admitted under the state-of-mind hearsay exception, OEC 803(3), and under the "excited utterance" hearsay exception, OEC 803(2). The trial court agreed that the testimony was

admissible. Looking first at relevance, the trial court determined that

> "with regard to relevance, I think it is relevant under the [analysis in *State v. Johns*, 301 Or 535, 725 P2d 312 (1986),] under [OEC] 404. And I think it is relevant [under OEC 404] because of the self defense issue in the case. I think it is relevant to show absence of mistake, absence of accident and to rebut the self defense issue raised by the Defendant."

The trial court then examined the hearsay objection.

> "With regard to the hearsay issue I find that under [OEC] 803(3), * * * I find that it is admissible as state of mind. And I think part of it would be admissible under the excited utterance exception—not all of it. Part of it would be. But I think in balance all of it would be admissible under [OEC] 803(3) exception for state of mind as discussed by the Supreme Court in *State v. Brown* [, 310 Or 347]."

Defendant renews his objections on appeal, contending that the testimony was hearsay, not admissible under the state-of-mind exception, and that the testimony constituted prior bad acts evidence inadmissible under OEC 404(3). The state responds that the victim's March 2010 statement to Rebecca Brown was admissible under the excited utterance exception and that both the March and May 2010 statements to Brown were admissible under the state-of-mind exception. The state also argues that the trial court correctly rejected defendant's "complaint that the victim's hearsay descriptions of his previously strangling her portrayed him in a bad light, or constituted 'propensity' evidence."

We first address whether the trial court correctly determined that the victim's statements to Rebecca Brown were admissible under OEC 404(3), which provides:

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Under that rule, evidence of uncharged misconduct by the defendant in a criminal case is not admissible to prove that the defendant has a criminal character or a propensity to engage in criminal behavior. Rather, the admissibility of uncharged misconduct must be based on its relevance to a contested fact that is material to the issues at trial. *State v. Pitt*, 352 Or 566, 575-76, 293 P3d 1002 (2012). Thus, when— as here—a defendant has admitted the *actus reus*, but contends that he did not act with a culpable mental state, evidence of prior bad acts may be admissible to counter that argument by, for example, showing the absence of mistake or accident, or that the defendant acted with intent. OEC 404(3).

On appeal, the state argues that those principles established the relevance of evidence that defendant previously had strangled the victim deliberately because that evidence tended to undermine his account that he had only accidentally strangled the victim on the night she died. In arguing to the contrary, defendant simply asserts that the evidence does nothing more than characterize him as somebody with a propensity toward aggressiveness.

We agree with the state that the evidence that defendant had strangled the victim on at least one previous occasion was relevant, under OEC 404(3), to establish his culpable mental state. A defendant's prior hostile acts towards a homicide victim have

> "special relevance to the issue of a hostile motive, which in turn is probative of intent. Evidence that shows a hostile relationship existed between a defendant and his victim tends to shed light on a defendant's *mens rea*. The state had the burden to prove beyond a reasonable doubt that defendant's acts were intentional.
>
> "[The Supreme Court]. noted in *State v. Johns* that '[i]ntent or state of mind is often the most difficult element of a crime to prove because many crimes are unwitnessed and even if a witness is present, the witness can only surmise the actor's state of mind. * * * [T]herefore courts very liberally admit prior crime evidence to prove *mens rea*.' 301 Or at 551."

*State v. Moen*, 309 Or 45, 68-69, 786 P2d 111 (1990).

Nonetheless, courts must take care to distinguish between evidence that actually is probative of a defendant's mental state and that which does nothing more than tend to establish a defendant's propensity for engaging in criminal conduct. In *Johns*, the Supreme Court identified factors that a court should consider in making that determination:

"(1)   Does the present charged act require proof of intent?

"(2)   Did the prior act require intent?

"(3)   Was the victim in the prior act the same victim or in the same class as the victim in the present case?

"(4)   Was the type of prior act the same or similar to the acts involved in the charged crime?

"(5)   Were the physical elements of the prior act and the present act similar?

"(6)   If these criteria are met, is the probative value of the prior act evidence substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury, undue delay or presentation of cumulative evidence?"

301 Or at 555-56. Under OEC 404(4), however, the final factor "is evaluated only when constitutionally required." *State v. Olson*, 263 Or App 246, 248, 328 P3d 704, *rev den*, 356 Or 400 (2014).

*Johns*, like this case, arose after a man killed his wife and was charged with murder. The *Johns* defendant admitted that he had shot his wife, resulting in her death, but claimed that the killing was accidental. 301 Or at 537-38. To disprove that claim, the state introduced evidence that the defendant had assaulted his ex-wife with a gun, attempting to shoot her, about six years earlier. *Id.* at 540-41. After considering the factors identified above, the Supreme Court held that the trial court did not err by admitting evidence of the earlier assault as relevant to prove the defendant's intent. *Id.* at 556-59.

*Johns* controls the outcome of the OEC 404(3) analysis in this case. Here, Rebecca Brown's testimony about defendant's prior strangulation of the victim gave rise to a

particularly strong inference about defendant's mental state when he strangled the victim on the night she died, precisely because the acts of strangulation were so similar. In March 2010, as on the night the victim died (as described by defendant), defendant strangled the victim with his hands, to the point of unconsciousness, in their bedroom. Put in terms of the first five *Johns* factors, the present charged act required proof of intent, the past acts were intentional (according to the victim's descriptions), the same victim was involved on each occasion, the acts involved were extremely similar, and so were their "physical elements." *Id.* at 555-56.[5] We conclude that the trial court did not err in rejecting defendant's OEC 404(3) objections to Rebecca Brown's testimony.

We next address defendant's contention that, even if relevant under OEC 404(3), the victim's statements to Rebecca Brown were inadmissible hearsay. Brown recalled that, in May 2010, the victim called her late one night. "She says you have got to come. I called the police. And so I went right over. And she was really upset. She had called the police and [defendant] was asked to leave and he left." Although the victim's statements to Brown were not *direct* commentary on her "state of mind, emotion, sensation or physical condition," as described in OEC 803(3), they do support an inference that the victim feared defendant and did not wish to be alone with him at their home. That permissible inference regarding the victim's state of mind is sufficient to bring the statements within the scope of the OEC 803(3) hearsay exception. *Clegg*, 332 Or at 441. Accordingly, the trial court did not err in allowing in Brown's testimony about her May 2010 conversation with the victim.

We turn to Rebecca Brown's testimony about events that occurred one day in March 2010. She related that the victim

"called me that night because we were—because she was— or that morning after and said that she was very upset and

---

[5] As noted, the sixth *Johns* factor—whether "the probative value of the prior act evidence [is] substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury, undue delay or presentation of cumulative evidence," 301 Or at 556—"is evaluated only when constitutionally required." *Olson*, 263 Or App at 248. Defendant does not meaningfully develop an argument that the constitution required exclusion of the challenged evidence in this case.

she wanted me to come over right away. And I came over and she told me that [defendant] actually put his hands around her neck and strangled her and she passed out—fell against the wall in the bedroom."

Brown testified that the victim was "very, very scared" when Brown arrived at her house. Her neck was bruised and she "had a tough time swallowing."

The victim's March 2010 statement that defendant had "put his hands around her neck and strangled her" does not qualify under the OEC 803(3) state-of-mind exception to the general rule against hearsay. As explained above, that exception does not apply to statements "of memory or belief to prove the fact remembered or believed." OEC 803(3). In her March 2010 statement, the victim described her recollection of a past event—the strangulation. Accordingly, Rebecca Brown's testimony about that statement was not admissible under OEC 803(3). The trial court's contrary conclusion was error.

That error does not present a basis for reversal of defendant's conviction, however, because the trial court also concluded that some of Rebecca Brown's testimony about the victim's statements was admissible under the OEC 803(2) excited utterance exception. In context, it is clear that that aspect of the trial court's ruling referred to Brown's testimony about the victim's March 2010 statement, as only that statement described a specific "startling event or condition" that was fresh in the victim's mind. OEC 803(2) provides:

"The following are not excluded by [OEC 802, the general rule against hearsay], even though the declarant is available as a witness:

"* * * * *

"(2)   A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

In *State v. Carlson*, 311 Or 201, 215-16, 808 P2d 1002 (1991), the Supreme Court discussed the excited utterance exception and explained that, for statements to fall within its scope, the trial court must conclude by a preponderance of the evidence that three elements are satisfied: (1) a startling

event or condition must have occurred; (2) the statement must have been made while the declarant was under the stress of the excitement caused by the event or condition; and (3) the statement must relate to the startling event or condition. *See also State v. Underwood*, 266 Or App 274, 277-81, 337 P3d 969 (2014) (discussing requirements of excited-utterance exception).

The victim's statements to Rebecca Brown in March 2010 meet that test. First, being strangled to the point of unconsciousness is a startling event. Second, the evidence amply supports the trial court's implicit finding that the victim described that event to Brown when she still was under the stress caused by having been strangled. The victim called Brown within hours of that event, asking her to come over "right away." She still was suffering physical effects of having been strangled, in that she had difficulty swallowing. Brown characterized her as "very, very scared," frightened, mortified, and "very, very sad." Those facts are sufficient to establish that the victim spoke to Brown when she still was under the stress caused by having been strangled. Finally, the victim's statements to Brown related directly to that event. We conclude that Rebecca Brown's testimony about the victim's March 2010 statements was admissible under OEC 803(2) and, accordingly, we reject defendant's third assignment of error.

Defendant's final evidentiary argument, presented in conjunction with his first assignment of error, is that the trial court erred by admitting statements that the victim made to Jeffrey Brown in October 2010. Jeffrey Brown and the victim were colleagues and had known each other for 19 years. He testified:

> "A: Well, the last time I spoke with [the victim] at work she told me that [defendant], her husband, had tried to strangle her. She was frightened. I asked her if she called the police. And she said he asked her not to because he feels that it would inhibit his ability to buy guns. And I said why would you want someone like this to have guns? She says, too late, he has already got two. * * *
>
> "* * * * *

"Q:   And could you describe [the victim's] demeanor at the time she is confiding in you?

"A:   She was nervous and she was frightened. And how I could visualize that, as well as the tone of her voice was that she was biting her lip as she was speaking of this. And I have always known [the victim] in moments of tension, stress, that she would bite her lip. And so I knew that she was serious.

"Q:   At that moment what did you do?

"A:   I told her that she probably ought to leave. And that if she didn't, she definitely needs counseling. And she said she didn't think it would do any good because of the way he drinks."

Defendant objected to that testimony, contending that it was inadmissible hearsay and unreliable. The state argued that the testimony was admissible under the state-of-mind exception, OEC 803(3).[6] The trial court agreed with the state.

On appeal, defendant argues that the testimony was hearsay, inadmissible under the state-of-mind exception in OEC 803(3) and inadmissible as prior bad acts evidence under OEC 404(3). Defendant also argues that admission of the evidence was not harmless. The state argues that the trial court correctly admitted the testimony under the state-of-mind exception, OEC 803(3). Alternatively, the state urges us to affirm the trial court's admission of the testimony pursuant to the excited utterance exception, under the "right for the wrong reason" doctrine. *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001). The state also argues that the testimony was not inadmissible evidence of prior bad acts under OEC 404(3). Finally, the state contends that any error in admitting the testimony was harmless.

We need not determine whether the trial court erred in admitting Jeffrey Brown's testimony about his conversation with the victim because we conclude that any error in that regard was harmless. The Supreme Court's decision in

---

[6] The state also argued that the testimony, even if hearsay, was admissible under OEC 804(3)(g), forfeiture by wrongdoing. The trial court rejected that argument, and the state does not renew it on appeal.

*State v. Davis*, 336 Or 19, 77 P3d 1111 (2003), frames the proper inquiry. In *Davis*, the Supreme Court determined that, under Article VII (Amended), section 3, of the Oregon Constitution,

> "Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict? The correct focus of the inquiry regarding affirmance despite error is on the possible influence of the error on the verdict rendered, not whether this court, sitting as a fact-finder, would regard the evidence of guilt as substantial and compelling."

336 Or at 32. Further, in *Davis*, the court explained that

> "a variety of considerations may properly inform that 'single inquiry,' including 'the nature of the error that occurred below,' [*Davis*, 336 Or at 32], and the 'context of the legal error.' *Id.* at 33. The court noted, for example, that the erroneous exclusion or admission of evidence would be harmless 'if the particular issue to which the error pertains has no relationship to the jury's determination of its verdict,' *id.* at 32, or if the jury 'would have regarded the *** evidence as duplicative or unhelpful to its deliberations.' *Id.* at 33. Ultimately, the Supreme Court in *Davis* concluded that the erroneous exclusion was not harmless, because it could not 'say that the excluded statements were merely cumulative of' admitted evidence—and, indeed, 'were qualitatively different than the evidence that the jury heard'—and because 'the excluded evidence goes directly to the heart of defendant's factual theory of the case.' *Id.* at 34."

*State v. Perkins*, 221 Or App 136, 143, 188 P3d 482 (2008) (omission in *Perkins*).

The same harmless error analysis applies when we analyze the effect of a trial court's erroneous admission of evidence. *State v. Maiden*, 222 Or App 9, 13, 191 P3d 803 (2008), *rev den*, 345 Or 618 (2009). Thus, erroneous admission of evidence that is "merely cumulative" of other admitted evidence and not "qualitatively different" than other admitted evidence generally is harmless. *See Davis*, 336 Or at 34; *Maiden*, 222 Or App at 13 (assessing, among other things, "the nature of erroneously admitted evidence in the context of other evidence on the same issue"). Here, the jury heard the same details contained in Jeffrey Brown's

testimony—an instance of strangulation, the victim's fear of defendant, defendant's possession of guns, defendant's drinking, and the victim's desire to pursue marital counseling—from other witnesses. In addition to the properly admitted evidence discussed earlier in this opinion, three other witnesses—including one called by defendant—testified at trial about their interactions with the victim in the days and months leading up to her death. Defendant does not assign error on appeal to the admission of any of that testimony, which we describe below.

Defendant's own witness, Hind-Bachofer, testified that she and the victim worked together for over 15 years and were friends outside of work. Hind-Bachofer testified that, sometime between six months and one year before the victim's death, the victim came to Hind-Bachofer's house and told her that defendant "had choked her to the point of unconsciousness." The victim spent the night at Hind-Bachofer's house because "[w]e were concerned for her safety." Hind-Bachofer did not recall seeing any physical marks on the victim, but also testified that she had not been looking for them. Hind-Bachofer also testified that the victim would occasionally discuss her marriage at work. She recalled that "the primary thing [the victim] complained about was that [defendant] did not have full-time work and when he did have part-time work he would send the money to his [ex-]wife and kids and did not contribute to their household at all * * *."

The second of those witnesses, Fletcher, worked with the victim for 10 years and became "really good" friends with her. Fletcher testified that, about four weeks before the victim's death, the victim had discussed wanting to see a marriage counselor. The victim was concerned about "going home and finding, you know, [defendant] had been drinking and leading to fights." Fletcher recalled that the victim had told her their fights were "usually over drinking or money." Fletcher thought that the victim "didn't want to go home" to a "bad situation at home with [defendant] being there and being * * * drunk by the time she got home from work." The victim discussed that topic with Fletcher every time they saw each other at work.

On the evening of October 24, Fletcher and another colleague from work went over to the victim and defendant's home. Fletcher recalled that defendant was drunk. "He was stumbling his words. He had even fallen over—kind of tripped or something. Just wasn't himself." Fletcher explained that she socialized with defendant approximately four times a month and that, on October 24, he was "just different" and "verbally outspoken." At one point in the evening, defendant brought out a shotgun, which he had recently purchased, to show his guests. Fletcher decided to leave after around an hour and a half because she "just didn't like how the situation was going."

The third witness, Johnson, also had worked with the victim for many years, but they hardly socialized outside of work. The victim and defendant attended a going-away party for Johnson in July 2010, as he prepared to move from Bend to Prineville. Johnson testified that, at the end of the party, the victim pulled Johnson aside and asked him if he would accompany the victim and defendant home. Johnson explained that the victim felt that defendant was "escalating" and "she wanted somebody else there." Johnson went home with them and sat on the back deck talking with defendant for around 45 minutes. At that point, they found that the victim "had passed out on the lawn." Johnson helped defendant get the victim to bed and went home.

In sum, two witnesses other than Jeffrey Brown— Rebecca Brown and Hind-Bachofer—described instances of defendant strangling the victim to unconsciousness. In testifying that the victim had described being choked until she passed out, their testimony was far more dramatic than Jeffrey Brown's unelaborated testimony that the victim told him that defendant "had tried to strangle her." Thus, Jeffrey Brown's testimony was "merely cumulative" on that point and added nothing "qualitatively different" to the record. *See Davis*, 336 Or at 34 (describing when evidentiary error is harmless); *Maiden*, 222 Or App at 13 (in assessing whether erroneous admission of evidence was harmless, court considers "any differences between the quality of the erroneously admitted evidence and other evidence admitted on the same issue"). With respect to other aspects of Jeffrey Brown's testimony, even more witnesses provided testimony that made

his "merely cumulative." Five witnesses described the victim as being afraid of defendant or being apprehensive about going home, one witness described defendant's possession of guns (and store receipts also established that defendant had purchased two guns shortly before the victim's disappearance), one witness described the victim's interest in pursuing marital counseling, and three witnesses, plus defendant's own "log," discussed defendant's alcohol consumption. In light of the other evidence admitted, we conclude that the challenged aspects of Jeffrey Brown's testimony were merely duplicative or cumulative of that other, more compelling evidence in the record. Because there is little likelihood that the admission of Jeffrey Brown's testimony affected the jury's verdict, any error associated with its admission was harmless.

In his fifth assignment of error, defendant challenges a provision of the judgment that orders him to "have no contact with" two specific individuals or any members of their families, apparently including during his term of incarceration. The state acknowledges that the court lacked authority to impose that requirement. We accept the concession. *See State v. Langmayer*, 239 Or App 600, 601, 244 P3d 894 (2010) ("[A] court does not have authority to impose a condition of incarceration."); *State v. Reed*, 235 Or App 470, 475-76, 237 P3d 826 (2010) (trial court erred by imposing a "no contact" condition of post-prison supervision in the judgment of conviction). We also agree with the state's assertion that the error can be remedied through entry of a corrected judgment.

Remanded for entry of a corrected judgment omitting the challenged "no contact" provision; otherwise affirmed.