Argued and submitted November 6, 2020, affirmed January 11, petition for review denied May 18, 2023 (371 Or 106)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JASON ALLEN GARLINGHOUSE,
*Defendant-Appellant.*

### Linn County Circuit Court
17CR09894; A168303

524 P3d 103

Defendant appeals from a judgment of conviction for first-degree murder, raising primarily evidentiary issues. He asserts that the trial court erred in several respects with regard to evidence presented by a detective concerning a recording made by the victim that captured the moments before and after the murder and concerning a text message sent by defendant, erred in allowing the victim's coworker to present evidence of the victim's state of mind, erred in limiting testimony concerning the victim's alleged abuse of children, erred in admitting evidence of an out-of-court statement by a coach of one of defendant's children, erred in admitting a summary of a police department call log, and erred in ruling that defendant's divorce attorney would need to invoke attorney-client privilege in the presence of the jury. *Held*: The trial court did not err in admitting testimony by the detective concerning either the recording or the text message under OEC 702. The trial court properly admitted the coworker's testimony under OEC 803(3) as evidence of the victim's state of mind. The trial court did not err in limiting testimony about the victim's alleged abuse of children. With respect to the court's evidentiary rulings concerning the coach's statement and the summary of the call log, the Court of Appeals concluded that the evidence was cumulative and any error was harmless. The court agreed with defendant that the trial court erred in indicating that defendant's divorce attorney would need to invoke privilege in the presence of the jury, but noted that in fact the privilege was never invoked and the substantive testimony by the attorney was cumulative of other evidence. The court therefore concluded that the error was harmless. Finally, the court rejected an argument that it should correct what defendant asserted was an erroneous entry into the Oregon eCourt Information system by the trial court. The court concluded that this was not an error in the judgment that could be addressed on appeal, and that it was a matter to be taken up with the trial court.

Affirmed.

David E. Delsman, Judge.

Daniel J. Casey argued the cause and filed the briefs for appellant.

Joanna Hershey, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

Defendant killed his estranged wife, S, and now appeals his conviction for murder, ORS 163.115 (2017), raising numerous challenges, mostly concerning evidentiary issues that arose at trial. As we will explain, we reject his assignments of error, concluding that (1) the trial court did not abuse its discretion in allowing testimony from a police witness regarding information contained on S's phone and defendant's phone; (2) cross-examination of defendant regarding some of that testimony likewise was not in error; (3) the court did not err in allowing testimony from one of S's coworkers as relevant to S's state of mind; (4) the court did not err in limiting testimony regarding S's alleged abuse of children; (5) any error in allowing testimony regarding defendant's contact with one of his children's coaches was harmless; (6) any error in admitting a summary of a police department's activity and call log was harmless; (7) the court erred in rejecting defense counsel's argument that the court should allow invocation of the attorney-client privilege applicable to testimony by his divorce attorney to be done outside the presence of the jury, but that error was nevertheless harmless; and (8) defendant's challenge to erroneous post-judgment entries into the Oregon eCourt Case Information (OECI) system is not well taken. Accordingly, we affirm the judgment.

## I.   FACTUAL BACKGROUND

To provide the necessary context for our discussion of the wide range of evidentiary issues raised on appeal, we provide an overview of the parties' theories of the case as well as of the evidence adduced at trial that is pertinent to our analysis. The disputed evidence will be described in more detail later in the opinion.

On the morning of February 14, 2017, defendant shot his estranged wife, S, eight times, killing her. He was charged with murder and claimed that he had acted in self-defense. The state's theory was that defendant had premeditated the crime, luring S to his house, shooting her, and attempting to stage a self-defense scenario. Defendant claimed that S had entered the house and they had argued, she had threatened him with a knife from his kitchen and

then left the house with the knife, he went into another room and got a gun and returned to the kitchen, and then she returned and approached him with the knife again and he shot her. As described in more detail below, a crucial piece of evidence was a recording on S's iPhone of the moments leading up to and immediately following the shooting.

Defendant and S were in the process of divorcing. S had moved out of their home several months before defendant filed for divorce in December of 2016; defendant remained in the home. When defendant had filed for divorce, he had sought equal parenting time with their children for both parents, and at first things had proceeded amicably. However, as shown by evidence from both the state and defendant, the divorce quickly became a bitter contest involving disputes both public and private, in particular surrounding the children. While defendant and S were living separately, their two children lived part-time with each parent, switching off on a weekly basis. Both S and defendant had new partners; S was living with a man named Brandon Stoering; defendant was seeing a woman, Ainsworth, who stayed at his home the night before the shooting. Brandon Stoering also was involved in a divorce at the time. Brandon's estranged wife, Kim Stoering,[1] and her new partner, Bynum, as well as defendant, made various allegations that S had been violent toward the children involved in the custody disputes. Witnesses for the state, by contrast, provided evidence that S feared defendant because of the contentiousness of the divorce, that she made efforts never to be alone with him, and that she recorded her interactions with him.

Although defendant remained in the family home after S moved out, S came to the home regularly during weeks when the children were in defendant's care but after defendant had left for work, to bring them their backpacks, get them ready for school, then take them to school. Defendant's father was generally present when S came over before school. Defendant and his father exchanged text messages about S entering the house, and whether or when defendant could exclude her from the house; during one such

---

[1] Because both Stoerings testified, we refer to them by their first names in this narrative.

exchange, defendant asked where his pistol was located and whether he could retrieve it, and his father indicated that it was in a bedside table drawer. Defendant communicated to others that he resented S's entry into the home and believed she was getting into things belonging to him and Ainsworth.

S made 12 early morning visits to the home between January 5 and February 13 during which she used her iPhone to record her visit. Each recording showed that she started the recorder immediately before entering the home at approximately 7:00 a.m. and recorded her interactions with the children and defendant's father thereafter. On the morning of the 14th, during a week when the children were staying with defendant, S drove to the family home and entered. Defendant's car was not there; his father's car was there. At 7:01 a.m., she began recording on her iPhone. The evidence of what happened in the moments before and after the recording began was some of the key evidence at trial.

The recording began with a sound that the parties appear to agree was a door opening, and several seconds thereafter, eight gunshots. For about three and one-half minutes, various faint noises were recorded; the evidence concerning those noises is the subject of one of the assignments of error discussed below. Three and one-half minutes after the shooting, S's iPhone recorded defendant's 9-1-1 call reporting that he had shot S in self-defense. During the 9-1-1 call, defendant said that S came into the house and yelled at him about the children not being there, that she attacked him, and that he shot her. When police arrived, they discovered S lying on the floor, with two backpacks and a set of keys clutched in her left hand, a bread knife lying in the palm of her right hand. They also discovered her cell phone on a counter. After they arrested defendant, he told a detective that S had shoved him against the counter by the sink. Defendant was wearing a gun holster when he was arrested.

Much of the evidence regarding some of what occurred at the house before S arrived was also undisputed. On the evening of the 13th, defendant exchanged vehicles with his father. Early in the morning of the 14th, defendant called in sick to work. He and Ainsworth made plans to take the children to McDonalds for breakfast. Defendant typed

several messages saying "Happy Valentine's Day" on his cell phone and sent them to himself; the first went through and the others were undelivered. He deleted those messages, then composed a message addressed to S indicating that he was taking the day off and would take the children to school and that she should bring their backpacks to the school. That message also was undelivered. He then told Ainsworth and the children that he was not feeling well and that they should go out to breakfast and that he would remain behind, which he did. His daughter testified at trial that she thought this was "pretty odd" because he had appeared to be fine that morning.

Some of the key testimony at trial came from Detective Trenary, who conducted forensic examinations of both defendant's and S's iPhones. S's iPhone had been locked when it was found at the scene of the homicide. Police obtained the PIN from Brandon, and Trenary unlocked the phone. He discovered that the Smart Recorder app was active, that the recording had paused after recording approximately one and a half hours (likely because the phone became low on space) and that the recording had not yet been saved. He was able to save the recording and was later able to enhance the audio on it. Much of the evidentiary dispute at issue in this case concerns Trenary's testimony regarding what he heard on the enhanced audio recording, and an exhibit that he prepared containing the enhanced audio and detailing his observations. To briefly summarize the testimony and exhibit, Trenary indicated that between two and 10 seconds into the recording, one can hear that the door opened and closed and then footsteps. At the tenth and eleventh seconds, two gunshots could be heard, followed by screams and the iPhone falling. At the 12th through 14th seconds, six more gunshots were heard, followed by sounds made by S in the moments before her death. Thereafter, breathing sounds could be heard, then at the 24th second, the iPhone was picked up, and there were "sounds similar to iPhone buttons being pressed." At 46 seconds into the recording, the iPhone was set down. Thereafter, various footsteps and breathing were heard throughout the next few minutes. Trenary also opined about several other noises during those minutes, noises that he likened to "rubber snapping," and a noise he

thought "similar" to tape coming off a roll. He also opined that one of the sounds was of defendant striking something and grunting, and another sound was like a shell casing rolling across a hard surface.[2] Trenary also testified about another app on S's iPhone, one that tracked how many steps she had taken. He found that on the morning of February 14, S had taken a number of steps followed by an interval during which he surmised she was driving to defendant's house, then she had taken 33 steps, then there was another interval, then she had taken her final 10 steps.

Trenary also testified about his examination of defendant's iPhone, including messages between defendant and his father. One such message was sent by defendant to his father the night before the homicide shortly after defendant had had a telephone call with his father. The message read: "Thank you for helping me load up my items from your basement and for letting me use your truck to get it all home. I didn't realize there was so much. [emoji] I just finished unloading it in the garage. I will bring your truck back tomorrow. Have a good night. Love you guys." Trenary testified that this message caught his attention because in his opinion this one contained an unusual amount of "extraneous content." In particular, Trenary noted that defendant and his father had just been on the phone with each other, that it was tonally different from other text messages, and in his opinion had been written for a third-party audience.

Trenary also testified about his recovery of the "Happy Valentine's Day" messages on defendant's cell phone that had been deleted, as well as the undelivered but not deleted message addressed to S. Based on his experimentation with similar iPhones, Trenary opined that the undelivered messages most likely had been created after the iPhone had been placed in airplane mode, and that taking the iPhone out of airplane mode would not have resulted in the messages being sent automatically. He testified that the first "Happy Valentine's Day" message defendant sent to himself showed as sent, delivered, and read at 6:12 a.m. on February 14. The second was created at 6:13 a.m. and showed as undelivered;

---

[2] No physical evidence concerning rubber or tape items was introduced, although there was evidence as to where various shell casings were found.

the third was created at 6:16 a.m. and also showed as undelivered. Then, at 6:25 a.m., defendant created the message to S ostensibly to communicate to her his plan to be at home that morning; that message also was undelivered.

Trenary also testified as to an additional recording located on S's iPhone, recorded at 6:02 p.m. on February 13, of an argument between S and defendant where they were fighting regarding the children, and S said, "Stay out of my vehicle and walk away please," to which defendant replied, "No. I'm going to give my daughter a hug before I go." S subsequently said "Get away from me please," "Jason, get away from me," "Walk away, please," and "Walk away."

The state also presented evidence from S's domestic relations attorney, Ivers, as well as defendant's domestic relations attorney, Ensor. Ivers testified that the divorce began amicably and that there was an agreed-upon arrangement regarding parenting time, but that it became acrimonious and in early February both S and defendant filed supplemental affidavits in the proceeding concerning temporary custody, each alleging abuse by the other. He further testified that on February 10, he received an order in the divorce case from the court and communicated its contents to S: She was given custody of the children, defendant was ordered to pay child support, S was to make payments on her vehicle, parenting time was to be 50/50, and defendant got exclusive use of the home as well as the financial obligations related to it. Ivers further testified that S was afraid that "defendant might hurt her if they were in the same space." Ensor also testified that the divorce had turned contentious, that defendant and S were fighting about the house, and that S had not been making payments on her vehicle. He testified that he informed defendant of the provisions of the court order by email on February 13, and that defendant made an appointment to see him the following day. That testimony is described in more detail below.

The state also presented evidence that defendant had vented about S to his coworkers and asked a Latino coworker if he knew any gang members. He had told that coworker in the week before the homicide that "out of all the people in this world [S] is the one that deserves to die."

Brandon testified that S was scared of defendant and would not go to see the children at home before school if defendant was there. He also testified that she was relieved about the custody decision in the temporary order.

S was a certified medical assistant, and her supervisor of 10 years, Dey, also testified at trial. Her testimony is described in more detail below in defendant's assignment of error concerning its admissibility. Dey testified that in the months preceding the homicide, S had "tremendous" fear of defendant and had asked Dey to accompany her to a court proceeding. Dey called the police once when S did not arrive at work on time because she was concerned about her. She indicated that she had a pact with S that S would not be alone with defendant, would keep a journal, would make recordings of all interactions with him if possible, and would "never enter the home alone when he was there."

The state also presented evidence through several witnesses about public confrontations between defendant and S in which both appeared to be angry. A coach of one of the children testified that after he observed a confrontation between them, he walked S to her car because she said she was scared. Evidence also was presented concerning another coach, Carver, who observed a confrontation and noted that both parties were angry. Testimony concerning Carver is discussed in more detail below.

The defense case focused on several things. First, the defense presented testimony, primarily from defendant's family and friends, concerning S's reputation for and history of violence and verbal abuse. Second, the defense presented evidence from Kim and Bynum that they had called the police and reported to the Department of Human Services that S had abused the Stoering children. Third, the defense presented evidence of altercations S had had with numerous individuals in the past.

Finally, defendant testified. He recounted that he had met S in high school and that she had been aggressive and abusive toward him when they were dating and throughout their marriage and had injured one of their children. He testified that she moved out after he told her she had to stop abusing their children, and that he initially agreed

to keep the divorce harmonious, but that S's aggression had continued. He testified that he was "ecstatic" about the court's order about which he was informed on the day before the homicide, because there would be 50/50 parenting time, S would need to make payments on her vehicle, and S would not be able to enter the house anymore; he testified that he was not concerned about paying child support because he did not think the amount would be much. He indicated that on the evening of the 13th, he borrowed his father's truck to move boxes, that the "Happy Valentine's Day" messages were meant for his mother and did not go through because the Wi-Fi was bad in the location where he sent them, that he had not put the phone into airplane mode, and that he later noticed he had sent them to himself.

Defendant testified that at 6:56 a.m. on the 14th, while he was in the kitchen, S had entered the house, and he had asked her what she was doing there. He asserted that she cursed at him when he told her the children were with his girlfriend, and then she threw her phone at him. He said that she grabbed a knife from his kitchen and threatened him with it if he did not return her phone, he threw the phone, then she shoved him into the sink and threatened to kill him. He said that he then heard the door slam, went to his bedroom and retrieved his gun from his safe and put on the gun holster, then went back to the kitchen to call 9-1-1. At that point, he said, S opened the door and came in again with the knife in her hand, and when she raised it to throw it at him or charge him, he shot her from about 10 feet away. He testified that, after the shooting, he picked up S's iPhone and attempted to unlock it to call 9-1-1, but did not otherwise recall what happened in the minutes between the shooting and when he called 9-1-1.

The jury returned a verdict of guilty, and this appeal ensued.

## II.  ANALYSIS

A.  *First and Second Assignments of Error*

In his first assignment of error, defendant argues that the trial court erred in permitting Trenary to present evidence concerning his opinion regarding the sounds on S's

iPhone recording from the morning of the 14th, as well his opinion about the tone of the text message defendant sent to his father on the evening of the 13th. He also argues that the trial court erred in allowing the prosecutor to make reference to Trenary's testimony concerning the recording in his opening statement.

As an initial matter, we note that defendant's first assignment of error involves three trial court rulings. He first raised an issue concerning Trenary's testimony after the prosecutor played the recording of S's shooting for the jury during opening statement. After the recording was played, the prosecutor told the jury that Trenary would testify about what he had done to amplify and identify the sounds on the recording. Defendant objected to the prosecutor's statements and was heard out of the jury's presence. He argued that Trenary's testimony would be inadmissible because this was something that the jury could perceive without the testimony of an expert witness. The state noted that Trenary had enhanced the recording and should be able to testify about what he heard on the enhanced recording. The court ruled that Trenary could "testify as to what he perceived," but noted that it was not ruling on the admissibility of any particular testimony at that point. After the jury returned, the prosecutor resumed, stating that Trenary would testify about the sounds on the recording but that he would not be able to tell the jury what the sounds were, but would testify about what he thought the sounds were similar to, "and we'll play that [enhanced recording] for you and let you draw your own conclusion."

As noted, the trial court did not make a ruling about admissibility of any specific testimony by Trenary at that point in time, so the argument on appeal reduces to an assertion that the trial court erred in ruling that Trenary would be able to testify about what he perceived. That, in itself, simply is not error. We conclude that, in this circumstance, the analysis needs to focus on the trial court's ultimate rulings on admissibility of Trenary's evidence and only then, if defendant were correct that the evidence should have been excluded, would we need to address whether the prosecutor's references to this evidence in opening argument is pertinent to whether there was reversible error.

We turn to the rulings that the trial court made when Trenary testified. The original unenhanced audio recording of the homicide was admitted into evidence without objection. Defendant also did not object to the enhancement itself—that is, he did not challenge Trenary's credentials to enhance the audio to make the sounds on it clearer or suggest that the enhanced audio by itself would not be admissible. Rather, his primary objection was that the enhanced audio—which was in the form of a video that contained overlay slides containing Trenary's observations about it—was not admissible because the visual text-overlays contained Trenary's opinions about the sounds. Defendant also challenged Trenary's testimony containing those opinions, arguing that "expert testimony is not allowed when it is something that a lay person, any juror, can hear and perceive for themselves" and that the jury would rely on his opinion as an expert. Before ruling, the trial court asked to hear a portion of the enhanced recording, and it was played at maximum volume in the courtroom, out of the presence of the jury. Thereafter, the court indicated that it had not been able to hear some of the sounds described by Trenary. The court clarified that it would not allow Trenary to summarize what was on the audio for the jury, but reiterated that he could testify about his perceptions of it when he had listened to it in a controlled environment using specialized equipment.[3] At that point, defendant characterized his objection as "lack of foundation, that this witness lacks the education and training necessary to accurately identify sounds by either file identification, wavelength identification, or actual human audio identification."[4] On appeal, defendant argues that the court erred in admitting Trenary's opinions concerning sounds on the recording as expert testimony under OEC 702, asserting that because this witness had been qualified as a digital forensics expert, a field requiring specialized scientific knowledge, it was error to admit this evidence because it was not helpful to the jury. The state responds

---

[3] Trenary had testified that he listened to the enhanced audio many times and that the sounds "are thick and they are layered and there are very subtle sounds that are occurring underneath more prominent sounds."

[4] The trial court did, in fact, conclude that the state had not laid a sufficient foundation regarding Trenary's testimony about an exhibit containing a "visual representation of the waveform" of the recording.

first that this was admissible lay opinion testimony under OEC 701 and argues alternatively that if the court admitted it under OEC 702, it did not err in doing so, or if it did err in doing so, the error was harmless.

Under OEC 701, "[i]f the witness is not testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to those opinions or inferences which are: (1) Rationally based on the perception of the witness; and (2) Helpful to a clear understanding of testimony of the witness or the determination of a fact in issue." Although the state is correct that the trial court's statement that Trenary could testify as to his perceptions could be viewed as a possible reference to OEC 701, that rule applies when a witness "is not testifying as an expert." In this case, it is undisputed that Trenary was presented to the jury as a detective with expertise in digital forensics, and Trenary had testified that he had reviewed the enhanced audio numerous times "in a sound isolated environment with high fidelity earphones [that] is much better than listening to it in this courtroom with all these people and over speakers." Moreover, the trial court clearly was relying on that fact when it stated that "this witness used special equipment to make an observation that was not readily apparent to an observer without that special equipment, and I guess I would analogize it to a slide or a sample being examined under a microscope[.]" Given that background, we conclude that the trial court made its ruling as to admissibility under OEC 702 in light of Trenary's expertise involving the enhancement of the audio.

OEC 702 provides that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." On appeal, defendant notes that to be admissible under OEC 702, expert testimony must be helpful to the trier of fact, that is, it "must assist a trier of fact to understand the evidence or determine an issue of fact that it may not be able to understand or determine as well on its own." *State v. Jesse*, 360 Or 584, 594, 385 P3d 1063 (2016). Defendant asserts that Trenary was in no better position to determine what the sounds on the audio were than the jury,

and thus his opinion would not be helpful to the factfinder. He asserts that the trial court's analogy of this situation to an expert testifying about a microscope slide was inapt, because a factfinder would be unlikely to know what they were seeing on a microscope slide whereas none of the sounds Trenary described required expertise to identify.

With the parties' arguments in mind, we return to an examination of Trenary's opinions about the sounds on the audio. As noted above, Trenary identified the sounds on the first 10 seconds of the audio as including the door opening and closing, footsteps, and S clearing her throat, followed immediately by the first gunshot. This was immediately followed by the remaining gunshots and the sounds S made while she was dying. He testified also that he heard something "like the iPhone striking the ground occurring during shots two and three." He opined that the phone had been in S's hand before it struck the ground, given the quality of the audio and the lack of indication from the audio that the phone's microphones had been muffled or obstructed by fabric. Trenary also offered his interpretation of what he heard several seconds after the shooting, what he thought sounded "similar to iPhone buttons being pressed repeatedly, then screen swipe, then buttons pressed again." About one to two minutes into the recording, he observed what he thought sounded "like rubber snapping," then a sound "similar to tape coming off a roll," then another sound like rubber snapping. Between the second and third minute, he identified breathing sounds, something that sounded like defendant "striking an object and grunting," and something that sounded like a shell casing rolling across a hard surface. He also indicated that he heard increased labored breathing immediately before the 9-1-1 call was made.

Defendant's arguments on appeal are, in essence, that all of the sounds described by Trenary are sounds that a juror would have been able to identify, and therefore Trenary's opinion as to what they were was not helpful to the jury. To the extent that this argument is that no expertise is necessarily required to identify those types of sounds, we agree that, as a theoretical matter, defendant is correct. The difficulty with defendant's argument, though, is that it does not sufficiently take into account the actual basis

for the trial court's conclusion that Trenary's observations were admissible. Trenary testified that he had listened to the enhanced audio numerous times in an environment in which such sounds could be discerned—"a sound isolated environment with high fidelity earphones"—and indicated that the conditions under which he reviewed the audio were significantly better than the conditions in the courtroom. Moreover, before ruling on this issue, the court actually listened to the enhanced audio and indicated it could not hear some of the sounds that Trenary described.

Whether a trial court has correctly determined that evidence offered under OEC 702 is helpful to the trier of fact is in some circumstances reviewed for errors of law and in other circumstances for abuse of discretion. *Jesse*, 360 Or at 597-600. As explained below, we conclude that there was an important discretionary aspect to the trial court's ruling, and that the trial court did not abuse its discretion in admitting Trenary's evidence about what he heard on the enhanced audio.

In *Jesse*, the court acknowledged that some of its cases indicated that a trial court's determination of whether OEC 702 evidence would be helpful to the trier of fact was reviewed for abuse of discretion, and other cases treated the question as a matter of law. After recounting some if its case law, the court quoted from *Yundt v. D & D Bowl, Inc.*, 259 Or 247, 259, 486 P2d 553 (1971):

"There are situations * * * where a jury clearly is not equally well qualified and needs help to find the truth. There are also situations where a jury clearly is equally qualified without help from opinion testimony such as offered here. It is the area between the clearly qualified and the clearly unqualified where the trial judge should be granted a certain latitude of decision in excluding or receiving expert opinion testimony."

*Jesse*, 360 Or at 599 (ellipsis in original). The court then summarized:

"In short, this court's prior decisions discussing a discretionary standard have involved the question whether proffered expert testimony would help the jury comprehend

the evidence. And, those decisions have confined the role of judicial discretion to circumstances involving factual issues neither clearly within, nor beyond, the jury's assumed level of understanding."

*Id.*

If defendant were correct in his implicit assertion that the jury's ability to hear what was on the enhanced recording during trial was on par with Trenary's ability to hear what was on the enhanced recording in a sound-isolated environment with high fidelity earphones, we would likely conclude that, as *Yundt* indicated, the "jury clearly is equally qualified without help from opinion testimony such as offered here" to evaluate the proffered evidence. 259 Or at 259. However, the situation presented here is not so clear-cut. The witness opined, and the trial court agreed after personally examining the proffered evidence, that "this witness used special equipment to make an observation that was not readily apparent to an observer without that special equipment." This is a situation where the trial court was in the best position to determine the helpfulness of Trenary's evidence of what he had heard on the enhanced audio in a sound-isolated environment with high fidelity earphones, in light of the court's ability to determine what could be heard in the courtroom where the jury would hear the enhanced audio. Although this situation is factually different from the situations presented in prior case law, that case law nonetheless is clear that where the trial court is in the best position to determine whether OEC 702 evidence would be helpful to the trier of fact, its decision is reviewed for abuse of discretion. We see no reason to conclude that an abuse of discretion occurred here. Defendant does not, for example, argue that the court abused its discretion under OEC 403 in admitting the evidence because its probative value was substantially outweighed by the danger of unfair prejudice.[5] We therefore reject defendant's argument that the

---

[5] In that regard, we note that Trenary made clear, as did the prosecutor in his arguments to the jury about this evidence, that Trenary was not an expert in *identifying* sounds. That is, his expertise as a digital forensic analyst provided him with the ability to hear things on the recording that were not audible in the courtroom, but he did not claim expertise in determining what those sounds actually were.

trial court erred in admitting Trenary's testimony concerning the enhanced audio of the homicide.[6]

We turn to defendant's argument that the trial court erred in overruling his objection to Trenary's opinion testimony about the content of defendant's text message to his father on the evening before the shooting. As noted above, the message in question was a lengthy text to his father that contained numerous details about defendant borrowing his father's truck shortly before. Trenary testified that the message had caught his attention because text messages usually are lacking in that amount of context and detail. Defendant objected based on "lack of foundation," and the prosecutor attempted to lay a foundation by ascertaining that Trenary had read other messages between defendant and his father and concluded that this one was "tonally" different. The prosecutor then argued that a person need not be an expert to testify that a message was tonally different. Defendant then argued that if any lay person could evaluate whether a message was tonally different, it "would be up to the jury to compare text messages." The trial court overruled the objection without comment. Trenary then noted the amount of detail in the text message and pointed

---

[6] Defendant also argues on appeal that the jury could have "duplicated the environment of the detective's lab simply by listening to the enhanced recording in the jury room" using high-fidelity headphones. Under ORCP 59C(1), "the jury may take with them all exhibits received in evidence, except depositions." And in *State v. Reyes*, 209 Or 595, 636-37, 308 P2d 182 (1957), the court held that where a recording was properly admitted into evidence, court did not err in allowing jury a machine on which to play it back in the jury room. But defendant cites no authority (and we are aware of none) for the proposition that a jury may make use of enhanced equipment to examine an exhibit where that equipment was not used in the courtroom when the evidence was received. Defendant further suggests that the state had the burden to show that such an arrangement would not have sufficed to allow the jury to evaluate the recording and that, having failed to do so, the state could not offer Trenary's testimony. Assuming for the sake of argument that it is permissible to allow the jury to later examine evidence using enhanced equipment that was not used when the evidence was presented, we disagree that the state had a burden here that was not met; as noted, it made a preliminary showing through Trenary that he had heard sounds on the audio that could not be heard in the courtroom, and the court ruled based on its own evaluation of whether the sounds could be heard in the courtroom. Had defendant made the suggestion in the trial court that the circumstances of the presentation of the audio to the jury could be altered, the court would have had an opportunity to evaluate whether it was possible to recreate the detective's sound-isolated environment for the jury. Because the trial court did not have the opportunity to evaluate that question in the first instance, we decline to address it.

out that this was sent only 13 minutes after defendant had called his father. He concluded that his "personal impression of it was that it was written for a third-party audience to read."

On appeal, defendant does not argue that the subject matter here was outside Trenary's area of expertise as a police officer—that is, he does not take issue with the foundation the state laid in that respect. Rather, he argues that because Trenary was qualified to testify as a digital forensics examiner, this was therefore "evidence of a scientific nature that is subject to OEC 702," and alternatively if it was not, that it was lay opinion testimony that was not helpful to the trier of fact. We reject without extended discussion defendant's assertion that this was offered as evidence of a scientific nature. "Scientific" evidence under OEC 702 is evidence that "'draws its convincing force from some principle of science, mathematics and the like.'" *State v. Henley*, 363 Or 284, 295, 422 P3d 217 (2018) (quoting *State v. Brown*, 297 Or 404, 407 687 P2d 751 (1984)). Trenary's opinion that this text message differed from numerous other text messages he had reviewed over the course of his career was within his area of expertise, but it was not scientific. That is, observations about how the contents of one text message differs from others does not draw its convincing force from any principles of science or the like, nor was the jury likely to have believed that it did. However, this also was not lay opinion testimony. Defendant's argument implies that any opinion testimony that is not scientific is lay opinion testimony. But not all expert opinion concerns scientific evidence. "Specialized expert opinion evidence based on a witness's training and experience draws its force from that training and experience, but not necessarily from the mantle of science." *State v. Rambo*, 250 Or App 186, 195, 279 P3d 361 (2012), *rev den*, 353 Or 203 (2013). Trenary testified that in the course of his experience in police work, he had examined numerous text messages, and based his opinion on this message on his comparison of its contents to the contents of other messages he had examined. Other than arguing that it was not "scientific" or "lay opinion," defendant makes no challenge that Trenary could not offer this opinion as nonscientific expert testimony based on his experience in police work under OEC

702. We reject defendant's challenge to this evidence without further discussion.

In his second assignment of error, defendant argues that the court erred in allowing defendant to be cross-examined about the sounds on the enhanced audio that Trenary had testified sounded similar to rubber and tape. However, the success of that argument is contingent on the success of his first assignment of error. Because the court did not err in admitting Trenary's evidence, it did not err in permitting defendant to be cross-examined on that topic.

B.   *Third Assignment of Error*

In his third assignment of error, defendant argues that the court erred in overruling his objection to aspects of Dey's testimony, including her safety plan with S.[7] Both parties argued below, and continue to argue on appeal, about our  decision in *State v. Blaylock*, 267 Or App 455, 341 P3d 758 (2014), *rev den*, 357 Or 299 (2015). After hearing those arguments, the court ruled that statements that S made that she was fearful would be admissible and that the safety planning related to "future fear as opposed to past acts or past conduct" would be allowed, but that it would exclude testimony about conduct that occurred prior to the statements. Defendant suggests on appeal that while evidence of S's fear of defendant could be relevant to assessing his claim of self-defense, evidence that she and Dey had a safety pact was not admissible under OEC 803(3) as evidence of S's "state of mind" because it was evidence that Dey was concerned about S's safety, not that S was concerned about her own safety.[8]

_____

[7] To the extent that defendant argues that the court should have excluded as irrelevant evidence that Dey had called the police in October 2016, we reject that argument without further discussion because, even if it were error to admit that evidence, there is little likelihood that it affected the verdict in light of our conclusion explained below that Dey's evidence concerning the safety pact was admissible. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) ("[I]f the particular issue to which the error pertains has no relationship to the jury's determination of its verdict, then there is little likelihood that the error affected the verdict.").

[8] Defendant argues that the "most reasonable inference" that can be drawn from Dey's testimony is that it was Dey who "insisted on" the safety pact. However, while Dey did testify that she was concerned for S, she also testified that S had expressed "tremendous fear and anxiety" about defendant, and Dey did not specify who proposed the plan. When asked if she had entered a pact with

There is a significant body of case law concerning the admissibility of "state of mind" evidence of murder victims. *Blaylock* is exemplary and has some similarities to the present case. There, as here, the defendant admitted to having killed his wife, but asserted that he did so in self-defense. 267 Or App at 456. There, as here, evidence was admitted "about statements that the victim made to friends and colleagues during the several months leading up to her death, in which she described defendant's violence, [and] her fear of him." *Id.* at 460. In *Blaylock,* we first considered a statement that the victim had made to a coworker the day before her death that she hoped the defendant would not be drunk when she got home. *Id.* at 461. That was admissible because "she was describing her then-existing state of mind related to her apprehension about going home and what she might encounter there." *Id.* at 462. The court then considered evidence of statements the victim had made to a friend that the defendant had "put his hands around her neck and strangled her." *Id.* at 464. The same friend also testified about another time several months later when the victim had called her and asked her to come over, stating that the police had been called, the defendant had been asked to leave, and the victim felt even more frightened than before. *Id.* The court concluded that the first statement about strangulation was inadmissible under OEC 803(3) because that exception "does not apply to statements 'of memory or belief to prove the fact remembered or believed,'" but as to the latter incident, this court concluded that

> "[a]lthough the victim's statements to Brown were not direct commentary on her 'state of mind, emotion, sensation or physical condition,' as described in OEC 803(3), they do support an inference that the victim feared defendant and did not wish to be alone with him at their home. That permissible inference regarding the victim's state of mind is sufficient to bring the statements within the scope of the OEC 803(3) hearsay exception."

*Id.* at 468.

---

S, she responded: "We called it a safety plan. We had specifics that we spoke of with respect to any opportunities to be in an alone setting with her husband. Those included always keeping a written journal of any interaction, all conversations, taking pictures if at all possible, and recording as much as possible, and to never enter the home alone when he was there."

Under *Blaylock,* it is clear that the basic substance of Dey's testimony that the court admitted—that due to S's fear of defendant she avoided being alone with him and recorded her interactions with him to the extent possible—was admissible to prove S's state of mind. Defendant argues that this evidence need not be viewed as evidence that S feared defendant, because S might have entered into the safety pact because Dey, her supervisor, insisted she do so. Even if that were so, the assumption on which defendant's argument rests is not sound. The court was not required to find that S rather than Dey proposed the safety pact in the first instance to admit this as evidence of S's state of mind concerning fear of defendant. Nor was the court required to assume in the absence of evidence that S was the one who proposed the safety pact that she merely acquiesced to it and that it therefore would not be evidence of her fear of defendant.[9]

Here, the challenged evidence was that S had entered into a safety pact which, by its terms, related to her fear that defendant intended to harm her. Whether she did so at the urging of Dey or not does not change the conclusion that her entry into the safety pact reasonably supports an inference as to her state of mind—that she feared defendant.

## C.  *Fourth Assignment of Error*

In his fourth assignment of error, defendant again does not identify one specific trial court ruling. Rather, defendant argues that the court erred in limiting evidence

---

[9] One of the cases cited in *Blaylock*, *State v. Clegg*, 332 Or 432, 31 P3d 408 (2001), further supports that conclusion. There, the defendant was convicted of aggravated murder based on the shooting of his wife, and the state developed evidence that he had hired two men to shoot the victim at her workplace because he wished to collect the proceeds on an insurance policy. *Id.* at 434. The case was built on circumstantial evidence, but the "piece of evidence tending most directly to connect [the] defendant with the crime was testimony concerning a telephone conversation between [the] defendant and [the victim] only moments before the murder." *Id.* at 436. After speaking with the defendant, the victim told a coworker that she was happy that the defendant loved her, and that she had told him she was about to go to the bank with Gladys but that he "insisted I not let Gladys take me, that he was going to take me when he took me to lunch." *Id.* The court acknowledged that the victim's statements to her coworker were not "direct commentary" on her state of mind, but "even if a statement merely reflects the declarant's state of mind or reasonably supports an inference as to the declarant's state of mind, it constitutes an assertion of the declarant's state of mind for purposes of OEC 803(3)." *Id.* at 441.

concerning S's alleged abuse of the Stoering children; specifically, defendant focuses on the court's limitation on the testimony from S's divorce attorney, Ivers, concerning the DHS investigation of S.[10] Various evidence ultimately was admitted (1) that shortly after the divorce had been filed, and shortly before Brandon and Kim's divorce went to trial, Kim and Bynum made a report to DHS that S had abused the Stoering children, (2) that defendant was "aligned" with Kim and Bynum, and (3) that a DHS investigation of S ensued. Ivers, S's divorce attorney, testified that "law enforcement, DHS, and *** other information that was going on kind of behind the scenes," made S "afraid that [defendant] might hurt her if they were in the same space." Before cross-examination, the prosecutor asked the court to limit evidence of the specifics of the allegations made to DHS, arguing that "I think they need the DHS caseworker or the folks who were actually involved." Defendant argued that this would be admissible nonhearsay to show the effect of the information on S. The state agreed that the existence of the DHS investigation was relevant and admissible. At that point, the court asked if either party intended to call DHS witnesses, and defendant indicated that he did.[11] The court then stated that it would be "better to have that information come from the person directly involved" and limited

---

[10] In this assignment of error, defendant also asserts that the trial court erred in limiting the testimony of Kim concerning alleged abuse by S, although he does not make a distinct legal argument on this topic. Defense counsel asked Kim if S had locked one of the Stoering children in the garage and pinched a child's penis, but the state asked questions in aid of objection whether Kim had witnessed these events or had been told of them by third parties, and she indicated that she had been told by others. The state argued that this was hearsay and defense counsel responded that it was admissible for "effect on the listener." The court sustained the objection without comment. It does not appear that defendant is arguing on appeal that evidence of what others told Kim was, in fact, admissible for its effect on Kim. To the extent that he is suggesting that the effect-on-listener hearsay exception is not limited to the listener but allows for admission of out-of-court statements to show the effect on someone who later was informed of the statements by someone else—a tenuous proposition at best—he failed to connect up this evidence. That is, the questions to Kim were not about the DHS investigation but about whether S had committed specific acts of abuse against children. Defendant made no argument to the trial court that connected this questioning to the DHS investigation, and offered no explanation to the trial court of how the effect-on-listener hearsay exception might apply to this specific evidence, or how any other hearsay exception might apply. We reject defendant's arguments concerning this evidentiary ruling without further discussion.

[11] Ultimately, no DHS witnesses were called.

Ivers's testimony to whether or not the DHS investigation "was a precipitating factor to [S's] emotional state." Defense counsel then asked the witness whether "the DHS case against [S] was part of the stress that you were talking about that she was [experiencing]." The attorney replied that "yes, absolutely it was." On redirect, the witness was asked, "without getting into specifics" whether allegations had been made to DHS "against [S]," and the witness replied that they had.

Defendant argues on appeal that the ruling limiting the cross-examination of this witness was in error, because details of the allegations of abuse made to DHS were not hearsay as they were offered to show the effect on S's mental state. No offer of proof was made by the defense concerning this evidence. However, an earlier witness had already been questioned about her knowledge of a "DHS investigation into abuse by [S]" of the Stoering children, and the parties' arguments to the court made it clear that the proposed evidence would concern a DHS investigation into child abuse by S, so we conclude that at least some of defendant's arguments that the court erred in limiting testimony about the abuse of the Stoering children are adequately preserved.

Defendant argues on appeal that the evidence in question was "not hearsay" because it would show the effect the DHS investigation had on S's state of mind. However, it does not appear that the trial court ruled otherwise: When viewed in context of other things said by the trial court as described above, it is clear that the court agreed that the investigation was relevant to S's state of mind and indicated that if the parties intended to offer additional evidence on the substance of the allegations, that such evidence should come from a person "directly involved" in the DHS reporting. That is, the court acknowledged that evidence on that topic could, in fact, be admitted as relevant to S's state of mind. The court limited Ivers' testimony on the specifics of the DHS investigation because the court indicated that such evidence would be admissible coming from a person who was directly involved. Thus, the court implicitly concluded that S's divorce attorney was not such a person. Had defendant made an offer of proof that Ivers was, in fact, directly involved in the DHS investigation, defendant's argument

might have more traction. But in the context in which the court made its ruling, the court did not err in limiting Ivers's testimony in the manner that it did.

Defendant makes an alternative argument concerning this evidence for the first time on appeal. He asserts that it was admissible under the "curative admissibility" doctrine. He argues that Ivers's answer that factors, including the DHS investigation, caused S to fear that defendant might hurt her contained inadmissible evidence and "opened the door" to evidence of the specifics of the DHS investigation. He argues that permitting that testimony violated the court's earlier ruling that "state of mind" evidence would not be permitted as to specific past conduct, and because the state offered that inadmissible evidence, he was entitled to counter it with otherwise inadmissible evidence. *See State v. Gutierrez*, 304 Or App 431, 438, 466 P3d 75 (2020) ("Under the curative admissibility doctrine, where one party offers inadmissible evidence, which is received, the opponent may then offer similar facts whose only claim to admission is that they negative or explain or counterbalance the prior inadmissible evidence, presumably upon the same fact, subject matter or issue." (Internal quotation marks and citation omitted.)). Putting aside issues concerning lack of preservation, the gist of defendant's argument is that the evidence that the court admitted "created the inference, implication, and/or impression that DHS was investigating *defendant* for alleged abuse, and thus [S] believed he had a reason to silence or punish her in relation to any cooperation she might provide to DHS, or had already provided." We disagree. As noted above, after the court ruled, Ivers was asked whether an allegation "had been made to DHS *against* [S]," and he replied that it had. (Emphasis added.) Moreover, testimony later came in from Bynum that she was "aligned" with defendant "because we both had DHS cases on [S] about the children." Defendant also testified that he had reported that S had harmed their son and called the police as well as reporting this to "the DHS caseworker that was already handling the abuse allegations against [S]." In sum, the only evidence concerning a DHS investigation indicated that S had been investigated; the evidence did not suggest that defendant had been investigated. This is not a

situation in which the curative admissibility doctrine, had it been raised in the trial court, would have applied.

## D.  *Fifth Assignment of Error*

Defendant next argues that the court erred in allowing the prosecutor to cross-examine him about a conversation he had with Carver, a sports coach of one of defendant's children. A number of witnesses testified about public confrontations between defendant and S at some of their children's sporting events. Carver testified that he coached defendant's son in wrestling, and on an occasion in late January 2017, he had witnessed defendant and S arguing about why their son was upset, and "that's the extent that I remember of it, yeah." He said, "Honestly, I can't remember other than [defendant] wanted to know why [S] was so upset or something. It's been a long time." Later, defendant testified that near the end of January 2017 during a wrestling meet, his son had told him that S had scratched his face, and that he had reported what his son said to the police and to DHS. On cross-examination, counsel inquired if defendant had asked Carver for an affidavit describing the scratching incident, and defendant replied that "I asked him if he had witnessed what my children were telling me had happened." When asked what Carver had replied, defense counsel objected on hearsay grounds. The state responded that it was not offered for the truth but to show defendant's bias or motive, and the court overruled the objection. Defendant responded that Carver had told him that he had not witnessed anything he would deem abusive. Defendant argues that to the extent this was relevant to his motive, it was dependent on the truth of the matter asserted—that Carver had not witnessed any abuse. The state responds that it did not depend on the truth of the matter but showed defendant's bias and motive—to show that he was attempting to establish that S was a violent person.

We do not address the merits of defendant's argument as to whether or not that was permissible evidence of bias or motive, because we conclude that any error was harmless. There was extensive evidence that defendant and S had numerous public and private disagreements about their children in the course of the divorce, and that various

allegations had been made that S had abused the Stoering children. That evidence, even if viewed by the jury for the truth of the matter asserted—that Carver did not witness any abuse—had little likelihood of affecting the verdict. The evidence was undisputed that defendant and his allies made numerous accusations during that time period—to DHS, to the police, and in affidavits in conjunction with the pending divorces—that S was abusive toward their children. Evidence that defendant had sought but not received confirmation of an alleged abuse incident from one individual was highly unlikely to have had any effect on the jury's verdict in light of all of the other evidence on that topic. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (Evidentiary errors are harmless if there is "little likelihood that the particular error affected the verdict."); *see also Dept. of Human Services v. J. L. S.*, 321 Or App 158, 163, 515 P3d 932 (2022) (Erroneously admitted evidence may be harmless if it is merely cumulative of, instead of qualitatively different than, other evidence presented to the factfinder.).[12]

## E.  *Sixth Assignment of Error*

Defendant next argues that the trial court erred in admitting into evidence a summary of a police department's activity and call log (the call log itself had been admitted into evidence without objection) that chronicled what police had done on the date of the crime, asserting that the summary was improperly admitted under the business records exception to the hearsay rule, citing *State v. Edmonds*, 364 Or 410, 435 P3d 752 (2019). We reject defendant's argument that this constituted reversible error without extended discussion, because we conclude that admission of the summary had little likelihood of affecting the verdict. The evidence was generally cumulative of other evidence that was admitted without objection, did not concern any material facts that were in dispute at trial, and its admission was

---

[12] Defendant asserts that the admission of that evidence was not harmless because it "rebutted defendant's testimony that he saw [S] grab their son's face *** with enough force to have scratched the child," and that that evidence "directly contradicted" defendant's testimony. Defendant's testimony, however, was not that he saw S grab their son's face, but rather that the children had described the incident to him afterward, and he saw a scratch on his son's face.

unlikely to have had any impact at all on the jury. *J. L. S.*, 321 Or App at 163.

F.   *Seventh Assignment of Error*

In this assignment of error, defendant argues that the trial court wrongly ruled that a state's witness—defendant's divorce attorney, Ensor—would be required to invoke the attorney-client privilege in the presence of the jury. We observe at the outset that, ultimately, defendant waived the privilege.

As background, we note that the issue of client confidentiality first arose during Ivers's testimony. At the start of his testimony, the prosecutor asked Ivers if he was bound by client confidentiality, and if he would require the court to order him to answer questions given that the confidentiality continued to exist despite S's death. Ivers responded that that was correct, and thereafter the court instructed him to answer questions about his representation of S during the divorce, and he did so. Thereafter, before the prosecutor called defendant's attorney Ensor as a witness, the following exchange occurred:

"[PROSECUTOR]:   I don't want to comment on [defendant] not waiving that privilege or contents or communications between his—him and his attorney, Mr. Ensor. So I've chatted with counsel about it. I think rather than just say—have him say 'I didn't get a waiver from my client' or anything like that just to have him say that 'I'm—as the attorney for [defendant] still living I'm constrained by, you know, the rules or more rules and I can't—there's certain questions I cannot answer,' if they're comfortable with that.

"[DEFENSE COUNSEL]:   I think that that conversation should be done outside the presence of the jury because if—if we're in a situation where he can't comment why are we putting him on the stand, and it looks overly prejudicial, as if my client is the one who's preventing him from, you know, truthfully testifying.

"THE COURT:   And I guess, [prosecutor], is it your intention to put him on the stand and only ask him about privileged material?

"[PROSECUTOR]:   No. But Mr. Ensor said it was his preference that I ask him questions in a certain way and

let him explain to the jury that he can't because he has to be—not 'coy' is the word but he has to be careful, and I just remember how he—at a prior hearing he answered questions and it was—it was like 'Well, I can't comment what I did in this case or what I had a conversation with my client but I can tell you that my normal practice is to send a letter to this address and that's my normal practice and I have no reason to believe that there was—I deviated from that in this situation.' I mean, he says that's how specific I can get but not more specific, but see how that will look to a jury, like he's hiding information, so he said it was his preference that he be allowed to comment on why he can't be specific. I need to satisfy Mr. Ensor's need to be ethical but I also don't want to comment on [defendant's] non-waiver of confidentiality so if there's a happy middle ground there I want to find it.

"THE COURT:   I would assume that he could testify that is protected by privilege.

"[PROSECUTOR]:   That's right.

"THE COURT:   And leave it at that.

"[PROSECUTOR]:   Are you okay with that?

"[DEFENSE COUNSEL]:   No. I prefer that it be done outside because it leaves the impression to the jury however you cut it—if he's continually saying, you know, 'I can't testify to that' and the state knows that he can't testify to that they're just trying to get the inference that he's withholding information.

"THE COURT:   Well, I'm not sure how we could take his testimony outside the presence of the jury.

"[PROSECUTOR]:   I think [defense counsel] was talking about just the waiver, so the initial interaction with the witness—

"THE COURT:   And that's why I suggested he could say that 'I can't answer based on privilege' without offering additional explanation that [defendant] may or may not have waived his right to that privilege.

"[PROSECUTOR]:   I just want to say that he's—I'm constrained by the rules. I can't—without putting the onus—putting the onus on the rules as opposed to [defendant] that's all I—we intend to do.

"THE COURT: And I'm—at this point other than what I've suggested I don't know how we can offer a prophylactic cure."

Other testimony was then taken, and then the prosecutor called Ensor as a witness. Defense counsel asked to approach the witness to "take care of an issue." The prosecutor asked if defense counsel wanted to do it in the courtroom with the jury present and defense counsel said that was fine. Defense counsel then told Ensor: "As with the last civil attorney in here our client has waived privilege so we don't need a directive. [Defendant] has waived privilege to the extent those facts are necessary within this litigation here."

Thereafter, Ensor testified that the divorce was contentious, with the parties fighting over custody, finances (including S's failure to make payments on a vehicle she was to be awarded in the divorce), and S coming into the house that defendant was to be awarded in the divorce. He testified that he had received the court's February 8 order on February 10 and had notified defendant of its contents by email on February 13, after which defendant had made an appointment to see him on the following day.

On appeal, defendant argues that the court erred in ruling that Ensor would need to assert client confidentiality with the jury present, noting that under OEC 513(2) "proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury." He relies heavily on this court's decision in *State v. Quintero*, 110 Or App 247, 823 P2d 981 (1991), *adh'd to on recons*, 114 Or App 142, 834 P2d 496, *rev den*, 314 Or 392 (1992). The state makes three responses—that defendant failed to preserve the issue adequately, that the questions about the date on which Ensor emailed defendant about the order did not elicit privileged information, and that any error was harmless.

Regarding preservation, we agree with defendant that the above-quoted exchange adequately preserved the issue whether Ensor would need to assert client confidentiality as to specific questions in the presence of the jury. As to the state's response that the information about the date

of the email was not privileged, *see generally State v. Ogle*, 297 Or 84, 87, 682 P2d 267 (1984), that seems likely to be correct but that is not actually the question presented by this assignment of error. The question is whether the court properly rejected defense counsel's argument that invocation of the privilege should be done outside the presence of the jury. As explained below, on that issue, defendant is right. However, as further explained, we agree with the state that the error was harmless.

Defendant's arguments rest in pertinent part on *Quintero*, which in some ways has similarities to the present case, and in other ways is significantly distinguishable. *Quintero* involved charges of attempted murder, during which the wife of one of the defendants was called as a witness. 110 Or App at 253. The court was informed that she intended to invoke spousal privilege under OEC 505, but the other defendants argued that precluding her testimony would violate their right to confront witnesses. The court ordered the witness to testify but instructed the jury that the testimony was not to be considered against her husband and limited the state's questioning regarding the husband's involvement in the crimes. She invoked the spousal privilege numerous times during her testimony and was ordered to answer the questions. *Id.* This court concluded that the trial court had erred in ordering the wife to testify, and that the defendant husband was prejudiced by the error. In doing so, we relied in part on the legislative commentary to OEC 513(2), which concerns comments upon or inferences from claims of privilege:

> "The legislative commentary to OEC 513(2) reads, in part:
>
> > "'The value of privilege may be greatly depreciated by means other than expressly commenting to a jury that it was exercised. Thus, the calling of a witness in the presence of the jury and subsequently excusing [the witness] after a sidebar conference may effectively convey to the jury the fact that a privilege has been claimed, even though the actual claim has not been made in their hearing. Whether a privilege will be claimed is usually ascertainable in advance and the handling of the entire matter outside the presence of

the jury is feasible. Destruction of the privilege by innuendo can and should be avoided. [Citations omitted.] 6 Wigmore section 1808 at 275-276. This position is in accord with the general agreement of the authorities that an accused cannot be forced to make [the] election not to testify in the presence of the jury. 8 Wigmore section 22678 at 407.' *Quoted in* Kirkpatrick, *Evidence* (1982) 200."

*Quintero*, 110 Or App at 255 n 9 (omissions in *Quintero*). This court concluded that the "situation here was not unanticipated or unavoidable." *Id.* at 256. It noted that not only was the witness's privilege discussed in the jury's presence, but the witness "invoked the privilege at least 14 times, in front of the jury," from which "the jury could have inferred that she was trying to keep damaging testimony about [the defendant] from them and, that impression was very likely to have intensified each time that she refused to answer." *Id.* The court went on to conclude that the error was prejudicial, noting that although the witness's testimony about factual matters "may have added only little information about the events that were described to the jury by other witnesses, but \*\*\* her repeated assertion of the privilege in front of the jury may well have affected the verdict" against her husband. *Id.* at 257.

In light of the reasoning in *Quintero*, we agree with defendant that his attorney's assertion of attorney-client privilege on defendant's behalf in front of the jury similarly was anticipated, and steps could have been taken to ensure that that did not occur. As defendant points out, Ensor could have been subjected to preliminary questioning by the prosecutor outside of the jury's presence to determine which, if any, of the prosecutor's questions were ones for which the privilege would be invoked, and the prosecutor could have been instructed not to ask those questions.

Where defendant's argument founders, however, is with respect to prejudice. This case differs significantly from *Quintero*, and in fact from all of the other cases on which defendant relies, because Ensor did not decline to answer any questions due to attorney-client confidentiality, and, in fact, defense counsel announced before the jury that defendant was waiving the attorney-client privilege. Bluntly, this

is not a situation where the jury would have drawn any negative inferences regarding that attorney-client privilege. Defendant does not, in fact, argue otherwise. Rather, his prejudice argument is that the harmless error inquiry also involves evaluation of a party's subsequent choices at trial, noting that in *State v. Green*, 271 Or 153, 175 n 15, 531 P2d 245 (1975), a trial court's erroneous ruling regarding admissibility of polygraph evidence was not harmless, although the defendant there ultimately stipulated to its admission. Defendant is correct to the extent that he is arguing that his subsequent waiver of the privilege is not, in and of itself, an answer to the harmless error question. That is, we assume that his subsequent choice to waive the privilege could have been strategic, to avoid an invocation of the privilege in the jury's presence. That ultimately is not dispositive here, though, because we conclude that Ensor's testimony—regardless of whether or not any of it would have fallen within the attorney-client privilege—had little likelihood of affecting the jury's verdict because it was entirely cumulative of other evidence.[13]

With respect to prejudice, defendant argues that the state is incorrect that the date Ensor sent defendant an email concerning the custody order was not privileged, and that although defendant also testified as to the date he received the email, "there is little likelihood defendant would have waived privilege and testified about his otherwise protected attorney-client communication, if the trial court had not wrongly denied defendant's request to have Ensor invoke privilege outside jury's presence." This argument is unpersuasive, even assuming defendant is correct

---

[13] We note that, to the extent that defendant, relying on *Green*, is arguing that what he did testify to on this topic cannot be considered in the harmless error analysis, that assumption is doubtful. As the state notes, in *State v. McGinnis*, 335 Or 243, 247, 64 P3d 1123 (2003), the court considered, and rejected, a defendant's argument that the court "adopt a rule that precludes consideration of a defendant's trial testimony in a harmless error review when the defendant's testimony was compelled to rebut illegally admitted evidence." The court concluded that any such rule could not be invoked "unless the evidence the defendant sought to rebut by taking the stand was an inadmissible *confession*, not evidence of some other kind, even if that evidence was obtained illegally." *Id.* at 253. (Emphasis in original.) This case does not involve testimony by defendant to explain or rebut evidence of his own prior statements, nor does it involve any asserted constitutional violation.

about the extent to which the attorney-client privilege might have applied to Ensor's testimony about the date he emailed defendant. We understand this argument essentially to be that had Ensor not testified, defendant would have invoked the attorney-client privilege or otherwise tried to avoid answering that he had received this news from Ensor on the day before the homicide.[14] He emphasizes that the prosecutor in closing argument noted that defendant having received news of the domestic relations ruling the day before the homicide provided motive. We are unpersuaded that, even if defendant had avoided giving testimony that he had received news of the ruling from Ensor, that would have affected the prosecutor's closing argument, or would have had any likelihood of affecting the verdict given that two witnesses sympathetic to the defense (defendant's own father as a defense witness and Bynum as a hostile witness for the state) had also provided evidence that defendant knew of the domestic relations ruling on February 13.

The present case is, in fact, quite similar to *State v. Lachat*, 298 Or App 579, 448 P3d 670 (2019), *rev den*, 366 Or 257 (2020). There, the defendant in a case involving assault and various sexual offenses argued that the trial court erred in admitting testimony from his counselor, over his objection that the evidence was privileged under OEC 507, that the defendant had forced himself on the victim and injured her. *Id.* at 585. We rejected the defendant's argument that his own testimony about what had occurred could not be considered in a harmless error analysis, relying on *McGinnis*, and *State v. Moore/Cohen*, 349 Or 371, 385 n 8, 245 P3d 101 (2010), *cert den*, 563 US 996 (2011) (noting that rule "is confined solely to issues involving the erroneous admission of unconstitutionally obtained pretrial statements"). In concluding that any error was harmless, we observed that the challenged evidence was "cumulative of other evidence in the record," including but not limited to the defendant's testimony on the subject. *Lachat*, 298 Or App at 590.

---

[14] On cross-examination, the prosecutor asked: "Do you remember exactly what day you got [the letter from the judge]? Was it the 13th?" Defendant replied: "I received information from my lawyer on the 13th." Thus, defendant was not asked about whether he had received a communication from his lawyer—he simply answered the question with that information.

Ensor's testimony was, in essence, that the divorce was acrimonious, that the parties were fighting about custody, finances, and S's entry into the home, and that defendant received information on the day before the shooting that S was being awarded custody of their children, all subjects about which there was no serious dispute. That testimony was cumulative of testimony offered and received without objection from numerous other witnesses, including but not limited to testimony by defendant himself. For that reason, we conclude that the evidentiary error at issue here had little likelihood of affecting the verdict.

G. *Eighth Assignment of Error*

Finally, we briefly address, and reject, defendant's eighth assignment of error. He notes that the amended judgment in this case indicates that a $200 fine was waived, but an entry into the OECI system failed to reflect that the fine was waived. He requests that we direct the trial court to correct the error. The state responds that the error is moot, asserting that the OECI entry has been corrected, and may be implicitly requesting that we take judicial notice of that as a matter of fact. Under ORS 138.257(1), we may "may affirm, reverse, vacate or modify the judgment or order, or any part thereof, from which the appeal was taken." And under ORS 138.105(3), with some exceptions, we have the ability to review "any intermediate decision of the trial court." In this assignment of error, defendant does not seek to have this court modify any aspect of the judgment, nor does he seek review of an intermediate decision of the trial court. As we have explained in prior cases, when a defendant wants to challenge post-judgment erroneous entries into OECI, "an appropriate course may be for [the] defendant to challenge the clerk's actions in the trial court, through a writ of mandamus, or otherwise." *State v. Ciraulo*, 301 Or App 849, 951, 459 P3d 960, *aff'd*, 367 Or 350, 478 P3d 502 (2020), *cert den,* 594 US ___, 141 S Ct 2836, 210 L Ed 2d 950 (2021); *see also State v. Lobue*, 304 Or App 13, 22 n 5, 466 P3d 83, *rev den,* 367 Or 257 (2020) (If the court clerk takes action inconsistent with fee provisions in judgment, "that is a matter to be taken up in the circuit court.").

Affirmed.